IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 10, 2007

## STATE OF TENNESSEE v. CALVIN RENARD STEEL

**Appeal from the Circuit Court for Lauderdale County**
**No. 7900     Joseph H. Walker, III, Judge**

_____

**No. W2006-02032-CCA-R3-CD   - Filed October 2, 2007**

_____

The defendant, Calvin Renard Steel, was convicted by a Lauderdale County jury of possession with the intent to deliver one-half gram or more of cocaine, a Class B felony, and received a sentence of twelve years as a Range II, multiple offender. In this appeal, he contends that the evidence was not sufficient to support his conviction and that the trial court erred in denying his motion to suppress evidence. We conclude that no error exists, and we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which DAVID G. HAYES and ALAN E. GLENN, JJ., joined.

Gary F. Antrican, District Public Defender, and David S. Stockton, Assistant Public Defender (on appeal); and D. Michael Dunavant, Ripley, Tennessee (at trial), for the appellant, Calvin Renard Steel.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; and Tracey Anne Brewer, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The defendant was arrested during the execution of a search warrant and was charged with possession with the intent to deliver cocaine and possession of marijuana. At the trial, Lauderdale County Sheriff's Investigator Brian Kelly testified that he and Investigator John Thompson often worked together to investigate drug crimes, usually by conducting undercover drug buy operations. He explained that cocaine can appear either in powder form or as cocaine base in rock form. He said cocaine can be changed from its powder form to rock form by cooking it with chemicals. He said it can be heated using a microwave oven. He said that in his experience, $20 could buy a small rock of cocaine.

Investigator Kelly testified that on June 29, 2005, he, Thompson, Deputy Jerry Mitchell, and Investigator Gregg Land planned to execute two search warrants. One was for a search of a house located on Cedar Street in Halls, which he said was not the defendant's residence. He said it was an unfurnished "shell of a house" without running water or electricity. He said that a weapon, a microwave oven, and some miscellaneous items were found in the house. He said an extension cord connected the microwave oven to a neighboring house.

Investigator Kelly testified that Thompson was driving when they approached the house on Cedar Street. He said that when they turned onto Cedar Street, he saw a black Mercury Mountaineer on the street in front of the house they intended to search and the defendant leaning into the passenger's side window. He said that the Mountaineer left as they drove up and that the defendant walked onto the property to be searched on Cedar Street. He said that they left their vehicle and that he and Thompson went toward the defendant because the defendant appeared to have been making a drug deal when he was on the street with the Mountaineer. He said the defendant walked to a tree that was on the property, turned, and walked toward the curb, at which point Kelly encountered the defendant. Kelly said Thompson, who had walked to the base of the tree, told him to detain the defendant. He handcuffed the defendant and found a bag of powder cocaine in his pocket, which he said was partially visible from outside the pocket, as well as $249 in cash. He said the cash included twenty-dollar bills but no hundred or fifty-dollar bills, although he could not remember what other currency was included.

Investigator Kelly testified that he remembered five other people being on the property and that other drugs were found around other people on the property that day. He said drug paraphernalia was not found on the defendant, and he did not recall any being found elsewhere on the property. He said that in his experience, people selling cocaine in rock form did not provide anything for clients in which to store the drugs but that cocaine sold in powder form would have to be in some kind of container. He said at least three people were arrested at the Cedar Street property. He said one man ran away from the property when officers arrived and was pursued by Mitchell. He called the house they searched on Cedar Street a "drug house."

Investigator Kelly testified that after leaving Cedar Street, he and the other officers went to the defendant's residence in Gates to execute a second search warrant, which they had before they arrived at the house in Halls. He said that unlike the house on Cedar Street, the defendant's house was a furnished home. He said the defendant was with them when they executed the search warrant on the defendant's residence. He said there were several small children in the residence, along with the defendant's wife, Avis Steel, and another woman. Drugs were recovered from the defendant's home.

On cross-examination, Kelly testified that neither he nor any other officers stopped the Mountaineer they saw on Cedar Street and that he did not know who the driver or passengers in that car were. He said that based on his experience, he thought the defendant was selling drugs to the people in the Mountaineer and that he preferred to focus his attention on drug sellers rather than buyers. He acknowledged that he did not see any money or drugs while watching the defendant and

the Mountaineer. However, he said that because he knew the house on Cedar Street to be a drug house and because it was common for drug transactions to take place in vehicles, he believed the defendant to be involved in a drug transaction. He said he also knew the defendant to be a drug seller, not a drug buyer. He said that he was not the affiant to the search warrant and that he was assisting Thompson, who was the affiant, in the execution of the warrant. He said Rickey Taylor, who went by the name Big Rick, owned the house on Cedar Street. He said Taylor was not at the house when they executed the search warrant and was not arrested in connection with the events of June 29, 2005. He acknowledged that he never saw the defendant enter Taylor's house. He said the other people on the property on June 29 were Cassandra Dennis, Dwayne Dickerson, Lewis Williams, and Dontae Sawyer. He said that he was not able to identify a man who ran away from the property but that people said it was Trent Liggins. Kelly was only able to recall that Dennis was arrested for possession of a Schedule II drug and not who else was arrested. He said he dealt specifically with the defendant and that Land arrested the others. He said that he entered the house after Thompson and Land had begun to search it and that nothing indicated that the defendant had been in the house. He said they did not intend to find the defendant at Taylor's house and agreed that it was happenstance that the defendant was there.

Investigator Kelly testified that he handcuffed the defendant after ordering him to the ground. He said he probably pulled his weapon and pointed it at the defendant. He said that he saw a man run away but that the defendant did not attempt to run. He said the bag of powder cocaine was found in the defendant's left front pants pocket and was partially in view. He said he found no weapons on the defendant or any other evidence of drugs on his person. He said he did not advise the defendant of his Miranda rights upon arresting him, but he noted that he did not ask the defendant any questions and that the defendant did not talk to him. Kelly said he and the other officers transported the defendant to the defendant's house in their undercover vehicle. He agreed that the aim of the warrant of the defendant's house in Gates was to search for marijuana and related marijuana paraphernalia. He said he did not participate in the search of the defendant's residence and stayed outside the residence.

Investigator Kelly testified that he had known the defendant and never knew the defendant to be employed. He said he was not aware that the defendant informed the intake officer at jail that he was employed. He said that he did not find any cocaine rocks on the defendant and that he did not know of any drug packaging paraphernalia that was found in the defendant's residence.

Investigator John Thompson testified that he had worked for the Lauderdale County Sheriff's Department investigating drug crimes since 1992 and had participated in hundreds of undercover drug investigations. He said a rock of cocaine base usually weighed about one-tenth of a gram and sold for about $20. He said he was the affiant on the two search warrants executed on June 29, 2005. He said his target of the search of Rickey Taylor's house on Cedar Street was anyone on that property that was involved in illegal activity. He said he was driving the undercover vehicle down Cedar Street en route to execute the warrant when he saw the defendant leaning toward the front passenger window of a black Mercury Mountaineer. He said the defendant appeared to be engaged in a drug transaction. He said that as the Mountaineer drove past his vehicle and his vehicle

approached the curb in front of Taylor's house, the defendant stepped into the yard of Taylor's house. He said he got out of the vehicle, ordered all people in the yard to the ground, announced himself as a police officer, and saw the defendant discard a clear plastic bag at the base of a tree in the yard. He said that the defendant was ordered to the ground and handcuffed by Kelly and that he retrieved the discarded bag, which he discovered contained cocaine. He said that he saw Trent Liggins run from the scene as the officers approached, that Liggins did not run toward the tree where he found the bag, and that Liggins left the scene before the defendant threw the bag. Thompson said he also saw Lewis Williams, Dontae Sawyer, Dwayne Dickerson, and Cassandra Dennis in the front yard of Taylor's house on June 29. He said that in addition to the bag of cocaine that the defendant threw and the bag of cocaine Kelly found on the defendant's person, officers also recovered sixteen bags of marijuana thrown by Dickerson, some crack cocaine and marijuana from Dennis, and a knife from Dennis. He said that inside the house he found a microwave with an extension cord running to a neighboring house and a glass jar containing a white substance appearing to be cocaine base. Thompson estimated that the bag the defendant threw toward the tree contained about $200 worth of cocaine base and that the powder cocaine in the bag in the defendant's pocket was worth about $300 to $350. He said $249 in cash was also recovered from the defendant. He said that a number of factors informed his decision to arrest the defendant for possession of cocaine with the intent to deliver, including the location of the arrest, his prior knowledge of the defendant, his knowledge of cocaine base sellers in the area, and the amount of cocaine recovered.

Investigator Thompson testified that after arresting the people on Cedar Street and searching the property there, he and the other officers went to the defendant's residence in Gates. He said that the defendant accompanied him in the residence, that he talked to the defendant's wife about drugs being in the residence, and that the defendant's wife retrieved a small amount of marijuana from the top of the refrigerator. He said the defendant claimed ownership of the marijuana.

On cross-examination, Thompson testified that he did not know who owned the house on Cedar Street into which the extension cord was plugged and did not investigate the owners. He acknowledged that Liggins ran near the tree where he found the bag of cocaine. He said he was not concerned with arresting Liggins or the people in the Mountaineer because his focus was on the property to be searched. He said he also did not stop the Mountaineer because he would rather get the deliverer of drugs, who he believed was the defendant, than the possessor. He said that the bag found at the base of the tree did not contain rocks separated into smaller bags. He said that no one was present in Taylor's house when the officers searched it and that he found no personal belongings of the defendant in the house. He acknowledged that the house had no running water, even though cocaine base is made using water. He said he did not seize the microwave or dust it for fingerprints. He did not find any scales, razor blades, or other cutting instruments on the defendant or in the defendant's house. He said lab reports indicated that Dennis was in possession of 2.8 grams of cocaine, that she was charged with possession of cocaine with the intent to deliver, but that she was convicted of simple possession.

Tennessee Bureau of Investigation Special Agent Jessica Marquez testified as an expert in drug identification. She analyzed an off-white chunky substance found in a plastic bag and white

powder found in another plastic bag. She said that the rock was one gram of cocaine and the powder was 3.2 grams of cocaine. She said that powder cocaine can be turned into rock cocaine using baking soda, water, and heat and that this could be accomplished using a microwave. She also analyzed green plant material given to her by Thompson, which she determined to be three grams of marijuana.

Joanne Spivey, a friend of the defendant, testified for the defense that she saw the defendant on June 29, 2005, on Cedar Street in Halls. She said she was the passenger in a vehicle driving down Cedar Street in front of Taylor's house when she saw the defendant. She said that she wanted to talk to him and that the driver stopped the car. She said she talked and laughed with the defendant for two or three minutes. She said that she did not buy or sell any drugs from or to the defendant and that they did not hand anything to each other. She said she later drove by the house again and saw Thompson and other officers there ordering everyone to the ground.

Dontae Sawyer testified that the defendant's wife, Avis Steel, was his cousin. He said he was present at Taylor's house on June 29, 2005. He said he arrived with Cassandra Dennis two or three minutes before the police arrived. He said they were driving by and stopped at the house to talk with his friends who were there. He said they did not enter the house but stayed in the front yard along with five or six other people, including the defendant. He said he did not buy or sell drugs from or to the defendant and did not see anyone else do so. He said that the police ordered everyone to the ground as soon as they arrived and that he did not see what the defendant was doing at that time. He said he saw Liggins run through the yard away from the house. He said he did not see the defendant talking with anyone in a vehicle and did not see anyone throw anything on the ground. He said he did not see the defendant go inside the house. He said he did not have any drugs on him that day and was not arrested.

On cross-examination, Sawyer testified that he arrived at the house around 4:00 or 5:00 p.m. He said that the house did not have any running water or electricity and that no one lived in it. He said he never heard the house called a drug house or crack house. Sawyer said he could identify the locations of everyone at the house before the police arrived, even though he said he had only been there two or three minutes.

Lewis Williams testified that he was a friend of the defendant. He said that on June 29, 2005, he stopped by Taylor's house to rest on the porch after washing his car. He said people liked to go to that house because there was a large tree in the yard that provided a lot of shade. He said it was common for people to be there. He said he was there about thirty minutes before the police arrived. He said he did not remember how long the defendant was there or whether he talked to the defendant. He said that he did not buy drugs from or sell drugs to the defendant that day and that he did not see the defendant in possession of any drugs. He said he did not see the defendant talking to people in vehicles and did not know where the defendant was when the police arrived. He said he never saw the defendant go into the house. On cross-examination, Lewis said people went to the house often even though it did not have running water or electricity. He said he was not aware there was a microwave in the house. He said the defendant was related to him through marriage.

The defendant's wife, Avis Steel, testified that on June 29, 2005, she was at home with her four children, two customers of her home-based hair cutting business, and possibly some other children. She said that the defendant was employed at Northdown Industries in Dyersburg at the time but that he was not working that day because it was the weekend. She said she did not know why the defendant was in Halls that day. She said she received a telephone call that the police had raided the house on Cedar Street, drove to the house and saw that the defendant was arrested, and returned home. She said that the police came to her house and that Thompson asked if she had any drugs in the house. She responded that she had just a "blunt" in the house that belonged to her and retrieved it for him from atop the refrigerator. She said that she told Thompson the marijuana belonged to her but that the defendant claimed ownership of it to avoid her going to jail. She said she was not arrested for possession of the marijuana until October 3. She said she pled guilty and received probation. She said that the marijuana was hers and that she had no knowledge of the defendant possessing cocaine on June 29. She said the police did not find any cocaine or other drugs, beside the marijuana she gave them, at her house that day. On cross-examination, Mrs. Steel was shown a calendar from June 2005 and acknowledged that June 29 was a weekday. She said her husband should have been working that day.

The defendant testified that he was working at Northdown Industries on June 29, 2005, during the first shift, which was from 6:00 a.m. to 2:30 p.m. He said he went to work that day but left at 1:00 because work was slow. He said he went to Cedar Street in Halls after work, called a friend, and bought an "eight ball" of powder cocaine, which he said was about the size of a fingertip. He said that he was addicted to cocaine and that his wife was not aware of his addiction. He said he had been paid that day and cashed his paycheck before going to Cedar Street. He said he had over $300 with him and spent $100 on the cocaine. He said he bought the cocaine from a friend who was in a vehicle, while he was on foot. He said that he bought the cocaine for his personal use and intended to snort it but that he never was able to. He said he did not sell any cocaine to anyone. He said he was in the area, waiting for a ride home, and had just talked to some people in a vehicle when the police arrived. He said he had just walked off the street into the yard when the police ordered everyone to the ground. He said he did not have any drugs aside from the powder cocaine in his pocket and did not throw anything to the ground when the police arrived. He said the rock cocaine officers found near the base of a tree did not belong to him. He said Trent Liggins ran past that tree and into a neighboring yard. The defendant said he did not go into Taylor's house and did not use the microwave to make crack cocaine. He said the house was known as a meeting place, not a drug house.

The defendant testified that officers took him to his house after he was arrested. He said that when they arrived, Thompson asked his wife if there were any drugs in the house and she brought him some marijuana. The defendant said he was in handcuffs and was being led by Thompson. He said he told Thompson the marijuana was his because he wanted to protect his wife from going to jail. He acknowledged that he had a prior misdemeanor theft conviction but said he was telling the truth that the only drugs in his possession were the powder cocaine he intended to use.

On cross-examination, the defendant said he did not have records of the paycheck he said he received on June 29, 2005, or any records verifying his employment at Northdown Industries. He said it was customary for him to be paid in the middle of the week. He said he bought the powder cocaine on Cedar Street and acknowledged that people sell and deliver drugs on that street.

Investigator Thompson testified in rebuttal that he had no doubt that the defendant threw the bag of rock cocaine at the base of the tree. He acknowledged that other people were on the scene, some of whom were also found to have drugs in their possession.

Based on the foregoing evidence, the jury returned a verdict of guilty of possession of cocaine with the intent to deliver and not guilty of possession of marijuana. The court sentenced the defendant to twelve years, as a Range II offender.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant challenges the sufficiency of the convicting evidence. He argues that the evidence was insufficient to prove that he had the intent to deliver the cocaine. The state counters that the evidence supports the jury's conviction of guilty beyond a reasonable doubt.

The defendant was convicted of the possession of one-half gram or more of a Schedule II drug (cocaine) with the intent to deliver under Tennessee Code Annotated section 39-17-417(a)(4). Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence; rather, we presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998).

The one element present in almost all criminal offenses which is most often proven by circumstantial evidence is the culpable mental state. See State v. Hall, 490 S.W.2d 495, 496 (Tenn. 1973). Other than an accused stating his or her purpose, intent, or thinking at the relevant times, the trier of fact is left to determine the mental state by making inferences drawn from the surrounding circumstances found by it to exist. See, e.g., Poag v. State, 567 S.W.2d 775 (Tenn. Crim. App. 1978). Tennessee Code Annotated section 39-17-419 states, "It may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." With respect to this inference, our review is to consider whether "under the facts of the case, there is no rational way the trier [of fact] could make the connection

permitted by the inference" beyond a reasonable doubt. County Court of Ulster County v. Allen, 442 U.S. 140, 157, 99 S. Ct. 2213, 2225 (1979). In other words, even though circumstantial evidence is needed for one element, the standard for evidence sufficiency remains the same.

In interpreting section 39-17-419, this court has determined that many facts and circumstances exist from which a jury may properly draw an inference that an accused intended to sell or deliver controlled substances. See State v. Brown, 915 S.W.2d 3, 8 (Tenn. Crim. App. 1995) (manner of packaging of drugs and absence of drug paraphernalia may support inference of possession with intent to sell, rather than possession for personal use); State v. Matthews, 805 S.W.2d 776, 782 (Tenn. Crim. App. 1990) (finding it proper for a jury to consider "the amount and value of a controlled substance . . . to infer an intention to distribute"); see also State v. Harold Wayne Shaw, No. 01C01-9312-CR-00439, Davidson County (Tenn. Crim. App. Oct. 24, 1996) (absence of drug paraphernalia and no proof at trial of personal use supported inference and conviction). This court has also held that it is proper for an experienced officer to testify as to the different traits of drug users and dealers. See State v. William Aubrey Trotter, No. 01C01-9701-CR-00019, Davidson County (Tenn. Crim. App. Feb. 24, 1998).

In the light most favorable to the state, the evidence showed that Investigators Kelly and Thompson saw the defendant standing by the road and leaning toward a vehicle in front of a reputed drug house. Based on the circumstances and their experiences, the two officers determined that the defendant was likely engaged in a drug transaction. Furthermore, when the officers arrived, the defendant threw to the ground a bag which contained a one-gram rock of cocaine. The defendant also had in his possession 3.2 grams of powder cocaine and $249 in cash. Thompson estimated that the total value of the cocaine the defendant possessed was $500 to $550. The defendant did not possess any drug paraphernalia. The defendant was in the company of others also found to have drugs in their possession. Inside the house around which the group was gathered, officers found a microwave oven and little else, which indicated to them that the location was used to convert powder cocaine to rock cocaine base. The defendant denied possession of the bag of rock cocaine and testified that the powder cocaine in his pocket was a $100 purchase he made that day for personal use. However, Thompson testified that the powder cocaine was likely worth $300 to $350.

We conclude that this evidence is sufficient to support the defendant's conviction, as there was sufficient circumstantial evidence from which the jury could infer the defendant's intent to deliver the drugs. In addition to the relatively large amount and value of the drugs in his possession, other evidence, including that the defendant was seen in behavior typical of a drug transaction and was gathered with other drugs users or sellers in an area known for drug sales, could lead a rational juror to infer beyond a reasonable doubt that the defendant possessed the cocaine with the intent to deliver it.

We note that, in his sufficiency argument, the defendant contends that much of the testimony that the state elicited from Investigator Kelly was not admissible. In particular, he argues that: (1) the state asked for an irrelevant opinion from Investigator Kelly regarding why Kelly focused on the defendant when he arrived to execute the search warrant at the house on Cedar Street; (2) the state

improperly asked Kelly to give an expert opinion about whether cocaine dealers typically have drug paraphernalia in their possession; (3) Kelly improperly referred to Taylor's house as a "drug house;" (4) the state solicited irrelevant testimony from Kelly regarding his law enforcement preferences; (5) Kelly's testimony that he knew the defendant from his experiences as an officer was "impermissible innuendo" of the defendant's prior bad acts; and (6) the state used the defendant's silence against him by having Kelly testify that the defendant did not make any statements to him at the time of the arrest. However, as the defendant acknowledges, contemporaneous objections to this evidence were not made, nor were these issues included in his motion for a new trial. As such, the defendant has waived any consideration of these issues on appeal. See T.R.A.P. 3(e) (stating that issues regarding the admissibility of evidence are waived if they were not raised in the motion for a new trial); T.R.A.P. 36(a) (stating that relief is not available to a party "who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of the error"); see also State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996) ("Ordinarily, issues raised for the first time on appeal are waived.").

## II. MOTION TO SUPPRESS

The defendant contends that the trial court erred in not suppressing evidence which he claims was seized as the result of an unconstitutional "stop, arrest, search and seizure." In his motion to suppress, the defendant argued that he was a "transient visitor" on the property searched on Cedar Street when the police arrived to execute the search warrant and that, therefore, his detention was illegal under State v. Curtis, 964 S.W.2d 604 (Tenn. Crim. App. 1997). After hearing testimony from Investigator Thompson, the trial court denied the motion, finding:

> [T]he defendant was not a transient visitor. A transient visitor is defined as a person who arrives at the premises being searched while the search is in progress.
>
> And the Court finds that doesn't fit the fact pattern of the testimony that I've heard here today, which was that the defendant was at the area of 113 Cedar Street, the officer observed what he considered to be a drug transaction which gave probable cause to investigate. The officer testified that he personally observed the defendant discard a bag. That bag could be considered abandoned property. And when he recovered the bag, it contained what appeared to be an illegal substance. The defendant was placed under arrest, and more illegal substance was found on his person incident to arrest. This Court finds none of that should be suppressed.

The defendant contends on appeal that the trial court erred in finding that the defendant was at the scene when officers arrived, and thus not a transient visitor, and that the officers observed the defendant engaged in criminal activity when they arrived. The state contends that the trial court's

-9-

findings were not in error, that the defendant was not a transient visitor, and that the detention of the defendant was justified because officers observed the defendant engaged in a drug transaction.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The application of the law to the facts as determined by the trial court is a question of law which we review de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures, and "article 1, section 7 [of the Tennessee Constitution] is identical in intent and purpose with the Fourth Amendment." State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting Sneed v. State, 221 Tenn. 6, 423 S.W.2d 857, 860 (1968)). Under these provisions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result of such a search or seizure should be suppressed unless the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. Yeargan, 958 S.W.2d at 629.

In the present case, the officers had a warrant to search the premises of the property owned by Rickey Taylor on Cedar Street, under probable cause that cocaine was being stored, packaged, sold, and/or distributed there. The defendant's arrest, and the seizure of cocaine and money found on his person, resulted when the officers arrived at Taylor's house to execute the search warrant. The defendant argues that the officers did not have the right to detain and search him because he was merely a transient visitor to the premises. In Curtis, this court stated that officers executing a search warrant may not detain and search a transient visitor to the searched premises merely because of the visitor's presence on the premises. 964 S.W.2d at 612. The court defined a "transient visitor" as

> a person who (a) arrives at the premises being searched while the
> search is in progress, (b) does not reside inside the dwelling or have
> a property interest in the dwelling, and (c) is not named in the search
> warrant as a party to be searched under color of the search warrant.

Id. The trial court found that the defendant was not a transient visitor. The trial court apparently accredited the testimony of Investigator Thompson that the defendant stepped onto the lawn of the premises before the officers exited their vehicle and began the search. The record does not preponderate against the trial court's factual finding.

However, regardless of whether the defendant was a transient visitor, his detention was justified, as it was based on more than his mere presence at the place to be searched. At a minimum, an officer's seizure of a citizen requires the officer to have "a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." State v. Moore, 775 S.W.2d 372, 377 (Tenn. Crim. App. 1989) (citing Terry v. Ohio, 392 U.S. 1, 21-22,

88 S. Ct. 1868, 1879-80 (1968)). In determining whether an officer's reasonable suspicion is supported by specific and articulable facts, "a court should consider the totality of the circumstances–the entire picture." Moore, 775 S.W.2d at 377 (citations omitted). An officer may make a warrantless arrest when the officer has probable cause to believe that the arrestee has committed a felony. T.C.A. § 40-7-103(a)(2). Probable cause to arrest exists if the facts and circumstances within an officer's knowledge are sufficient to warrant a prudent person in believing that the arrestee has committed an offense. Beck v. Ohio, 379 U.S. 89, 91, 85 S. Ct. 223, 225, 13 L. Ed. 2d 142 (1964); State v. Melson, 638 S.W.2d 342, 350-51 (Tenn. 1982).

In this case, officers approached a house at which they had probable cause to believe drugs were sold. They saw the defendant, whom they knew to have previously sold drugs, standing outside the house, talking to people in a vehicle in a manner that suggested he may have been involved in a drug transaction. This information warranted, in the least, a detention based on reasonable suspicion of drug activity. See Curtis, 964 S.W.2d at 614 (holding that officers had reasonable and articulable facts to detain defendant who arrived at place being searched for drugs based on prior information linking defendant to drug involvement). However, before Investigator Kelly reached the defendant, Investigator Thompson observed the defendant throw a bag toward the base of a tree, and Thompson instructed Kelly to arrest the defendant. Taken together, these facts provided probable cause to believe that the defendant was involved in a drug transaction and, thus, the officers had probable cause to arrest the defendant. As such, they were permitted to search his person incident to the arrest. See United States v. Robinson, 414 U.S. 218, 235, 94 S. Ct. 467, 477, 38 L. Ed. 2d 427 (1973). Thus, the defendant was not entitled to suppression of the powder cocaine and money recovered from his pockets. The trial court did not err in denying the defendant's motion to suppress.

## CONCLUSION

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE

-11-